(No. 33045.—)

KANKAKEE COUNTY HOUSING AUTHORITY, Appellee, *vs.* LAURA SPURLOCK, Appellant.

*Opinion filed May 24, 1954—Rehearing denied July 13, 1954.*

Moore, Ming & Leighton, of Chicago, (Christopher C. Wimbish, and George N. Leighton, of counsel,) for appellant.

Edward A. McIntire, of Kankakee, (Donald Gray, of counsel,) for appellee.

Mr. Justice Daily delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Kankakee County in an eminent domain proceeding instituted by Kankakee County Housing Authority, the appellee, to condemn a parcel of real estate owned by Laura Spurlock, the appellant, for use as a public housing site. Appellant does not attack the adequacy of the $7200 compensation awarded her, but urges that the taking was unlawful for the reason that her land is to be utilized for the construction of a project "devoted" to race segregation.

The facts which generated appellant's claim show that after conducting various surveys, appellee proposed to meet the housing needs of the community by erecting forty public housing units on a site known as Hardebeck's Sub-

division and eighty identical units on a site some four blocks distant. Though part of one overall program, the projects were designated as 39-2 and 39-1, respectively. The proposed site for project 39-2 is a slum area, the elimination of which will also serve a public purpose. (*Zurn* v. *City of Chicago*, 389 Ill. 114.) It is composed of eleven parcels of land all owned by persons of the Negro race, and ninety-nine percent of its inhabitants, who will be displaced, are likewise members of the same race. On the other hand, the proposed site for project 39-1 is vacant land and apparently owned by persons not members of the Negro race. Following the formation of preliminary plans, appellee submitted them to Federal authorities as part of an application for an annual-contributions contract for Federal funds. One section of the plan, titled "Racial Equity to be Achieved," reflects that the estimated distribution of the 120 units will be 80 for "white" and 40 for "non-white," a distribution of 66.7 percent and 33.3 percent, whereas to "achieve racial equity based solely on the volume of substandard housing," the distribution would be 73 percent and 27 percent, respectively. The section concludes that the actual needs, reflected by the figures last quoted, had been weighed in this instance because appellee was of the opinion there would be a higher percentage of eligible tenants among the nonwhite people. It appears without question that this breakdown of the distribution necessary to achieve racial equity was included in the plan as a requirement of the Federal agency and was not prompted by any thought of racial segregation or discrimination on appellee's part. The only other section of the plan we find to be pertinent is titled "Long Range Program of Project Location" and concludes with this language: "As stated above, the entire 120 dwelling units reserved are to be constructed at once, with 80 units on a vacant site * * * for white occupancy, and 40 units on a slum site * * * for non-white occupancy." Ap-

pellee's application for funds was approved by the Federal agency and among the Federal officials giving approval to appellee's plan was the agency's chief of racial relations.

Thereafter, appellee filed a petition to condemn the eleven parcels needed for project 39-2, alleging that it sought to acquire the land "for the purpose of constructing thereon a housing project for public use * * *." It should be noted here that since *Krause* v. *Peoria Housing Authority*, 370 Ill. 356, acquisition of land for low-rent housing and slum clearance has been deemed a public purpose. Appellant, and the several other owners, filed a motion which controverted appellee's right to condemn and asked that the petition be dismissed. Briefly, the motion alleged that the taking is not for use by the public but for use "by the Ethnic group commonly known as Negroes," and therefore is a taking for a private purpose; that the used described in the petition is not a public use because it is to erect, establish and maintain a race segregation housing project contrary to the laws and public policy of the State of Illinois; and that the acts and conduct of appellee were violative of the rights of the landowners protected and guaranteed by due process of the State and Federal constitutions. After hearing evidence offered in support of said motion, the trial court denied the motion to dismiss and ordered a jury trial to determine the value of appellant's land. A jury was selected and sworn but, before any evidence was heard, appellant filed a motion to discharge the jury for the reason that it "had come to her attention" that Negroes were excluded from the jury panel. Evidence was also presented on this issue, over appellee's objection, and, at its close, the motion was denied and the cause proceeded to verdict and judgment. This appeal has followed with the principal assignments of error being that the trial court erred in denying both the motion to dismiss the condemnation petition and the motion to discharge the jury.

Appellant's argument that the taking of her land is violative of the laws and policy of both State and nation is predicated, in the first instance, on the conclusion "that the record inescapably shows appellee has administratively determined that appellant's land is to be used for the construction of a project devoted to race segregation." We, however, do not interpret the record as revealing any definite or official determination that race segregation will be enforced in the project. Analyzed in its entirety, the evidence shows that the whole question of occupancy by race was injected into appellee's housing program by the requirement of the Federal Housing Administration, whose financial aid was sought, that appellee submit in the outline of its housing program a definite numerical estimate of the distribution of the 120 units proposed, necessary to achieve racial equity between groups classed as "white" and "nonwhite." The distribution figures arrived at by appellee under such compulsion, based as they were on volume of substandard housing and estimated tenant eligibility, of a certainty cannot be said to have been prompted by any administrative decision that there would be enforced race segregation in the program. The only other reference to occupancy by race in the program approved by the Federal agency is found in a paragraph entitled: "Long Range Program of Site Location," where it is stated that appellee will build eighty units on the vacant site for white occupancy and forty units on the cleared slum site for nonwhite occupancy. While this statement, standing alone, might be construed as reflecting some intention to enforce race segregation, such a conclusion is dispelled by the testimony of Armen R. Blanke, chairman of appellee, given in explanation of the plan submitted to the Federal agency.

When Blanke was asked if it had been decided if the forty units would be occupied 100 percent by colored people, he replied: "It has not been," explaining that appellee

presently looked upon the forty units as being built to accommodate the colored persons who would be displaced by the clearance of the slum area. Later, when pointedly asked if there was going to be racial segregation in the eighty-unit project, the witness had this to say in explanation of the whole program: "I can only answer that on the basis of what we hoped would be the working out of the situation. All members were well aware that we have no authority or right. to discriminate between races. We hoped the situation would solve itself into a situation where the colored people would occupy 40 to the north, and the 80 to the south by white people. *There was no official action taken pointing toward that.* The statement on Exhibit 10, Sheet No. 3, [*i.e.,* the estimate on 'Racial Equity to be Achieved,' heretofore referred to] has a different meaning than I accepted it to be when I first saw it. We thought we had to have 40 for the non-white, and 80 for the white. That didn't have to be any specific unit." Following this, Blanke answered that the 80 units would "not necessarily" have to be rented to white persons exclusively; then, in contradiction to all his previous testimony, he later replied: "At present, yes," when asked: "Then the present intention is to segregate the white from the colored?" Despite the last answer of the witness, which is of doubtful quantity in view of his previous testimony, we think it manifest from his testimony that appellee has made no official or administrative determination that the housing project will be "devoted" to race segregation or that such segregation will be enforced. It would appear, rather, that the members of appellee's administering body are cognizant of the existence of limitations on the manner in which they may achieve the racial equity the Federal housing agency requires and that there is no intention to enforce racial segregation. Blanke's testimony serves also to show that the references in appellee's plans to occupancy.

by races resulted from a desire to meet the Federal requirements and not from any administrative decision that race segregation will be enforced. Indeed, the Federal agency must have likewise construed the plan when its chief of racial relations gave his approval to it. We cannot agree with appellant that the evidence inescapably shows that race segregation is to be enforced in appellee's program.

In cases involving a variety of municipal corporations, this court has stated the presumption of law to be that public officials will properly discharge their duties and that this court will not anticipate evasion or improper performance of such duties. Where municipal action has been attacked on the ground that its enforcement will be unreasonable and unconstitutional, it has been held that it will not be presumed in advance that the municipal corporation will do an unconstitutional act and that the party attacking such action has the burden of proving, by evidence which is definite and certain, the conditions under which the municipal action may be obnoxious to the constitution before a court will be justified in disturbing such action. (*Jewel Tea Co.* v. *City of Troy,* 80 Fed. 2d 366; *Ferguson Coal Co.* v. *Thompson,* 343 Ill. 20; *Behnke* v. *Village of Brookfield,* 366 Ill. 516.) In the cited cases the court held that it would not be presumed in advance that the municipal corporations would do an illegal act despite the fact that they had already adopted ordinances, the constitutionality of the enforcement of which was in doubt. In the present case, there is a complete lack of proof of any formal action by appellee embracing the allegedly illegal purpose which appellant would have us attach to appellee's exercise of its admitted power to condemn her land. All that is shown is that to acquire Federal funds appellee must achieve equitable distribution of its housing between whites and nonwhites, that appellee is aware of its duty to achieve racial equity and not to discriminate,

and that there has been no decision to enforce racial segregation. As the situation appears in the record, appellant has proved at most that appellee might, in the future, perform some illegal act. The presumption is that appellee will refrain from an illegal act and will make the ultimate distribution of its housing units in a lawful manner. If that is not done, or it is thought that appellee is guilty of discrimination, such questions can be decided and presented in proceedings for that purpose. (Cf. *Johnson* v. *Mayor and Council of Baltimore,* 148 Atl. 209.) We conclude, therefore, that the evidence was not sufficiently definite and certain to establish that the taking of appellant's land was for an illegal or unconstitutional purpose and hold that the court did not err in denying appellant's motion to dismiss the petition.

Appellant's final contention is that the court erred in denying her motion to discharge the jury for the reason that "it had come to her attention" that Negroes were excluded from the jury panel. It is sufficient to point out that a challenge to the jury array comes too late when made after the jury is chosen and sworn. (*St. Louis and O'Fallon Railway Co.* v. *Union Trust and Savings Bank,* 209 Ill. 457; *St. Louis and Southeastern Railway Co.* v. *Casner,* 72 Ill. 384.) The court properly denied the motion.

For the reasons stated, we think it manifest that the condemnation proceeding instituted by appellee was within its delegated powers, was for the dual public purpose of providing for low-income housing and slum clearance, and was not shown to be in violation of any rights secured to appellant either by law or by constitution. Accordingly, the judgment of the circuit court of Kankakee County is affirmed.

*Judgment affirmed.*